# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

FLYING J, Inc.,

               Plaintiff,

                                  **Case No. 08-C-110**

     **-vs-**

J.B. VAN HOLLEN, Attorney General of
Wisconsin, ROD NILSESTUEN, Secretary
of the Wisconsin Department of Agriculture,
Trade and Consumer Protection,

               Defendants.

# DECISION AND ORDER

At issue in this case are the motor vehicle fuel provisions of the Wisconsin Unfair Sales Act (the "Unfair Sales Act"), Wis. Stat. § 100.30. The express purpose of this depression-era legislation is to restrain the "practice of selling certain items of merchandise below cost" and to protect "merchants who fail because of the competition of those who use such methods..." § 100.30(1). At the same time, federal antitrust law exists for "the protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). The Court finds that the Act's motor vehicle fuel provisions are unconstitutional because they violate the Sherman Act's prohibition against restraints of trade. *See* 15 U.S.C. § 1.

# BACKGROUND

Flying J, Inc. ("Flying J") is a Utah corporation that operates travel plazas in Black River Falls and Oak Creek, Wisconsin. The defendants, J.B. Van Hollen and Rod Nilsestuen, are charged with enforcement of the Unfair Sales Act.

## I. The Unfair Sales Act

The Unfair Sales Act was enacted in 1939, when the average retail price of gasoline was 18.8 cents per gallon. *See* Wis. Stat. § 100.30. The Unfair Sales Act currently mandates a minimum mark-up of 9.18% above the "average terminal price," a proxy for wholesale costs. The purported purpose of the 9.18% markup is to "cover a proportionate part of the cost of doing business." § 100.30(2)1m.c. In the 69 years following its enactment, the minimum markup formula (originally 6%) was amended only once. In 1997, the Wisconsin legislature amended the markup formula to require a 6% markup above certain actual costs *or* a 9.18% markup above the "average terminal price," whichever is greater. § 100.30(2)1m.c. This amendment took effect in Wisconsin on August 1, 1998.

In August 1998, the average retail price of regular gasoline in the United States was $1.03, and the average retail price of diesel was $1.01. Applying Wisconsin's 9.18% minimum markup to 1998 prices, and assuming that the retailer purchases at "average terminal price" under the Act, a gallon of motor fuel that retails at between $1.01 and $1.03 per gallon has a built in markup price between $.08 and $.09 per gallon.

Case 2:08-cv-00110-RTR   Filed 02/11/09   Page 2 of 18   Document 50

Since the 1997 bill, the Wisconsin legislature has not adjusted the markup formula despite intervening changes in technology, economic conditions, and rising prices in the oil and gas industries.  In May 2007, gasoline and diesel prices were as follows:

- In the Midwest region of the United States, the retail price of regular gasoline per gallon reached **$3.32** per gallon, and the price of diesel fuel reached **$2.78** per gallon.

- Prices for fuel in Wisconsin (charged by competitors of Flying J) reached **$3.49** per gallon for regular gasoline and **$2.99** per gallon for diesel fuel.

- Applying Wisconsin's 9.18% minimum markup and assuming that the retailer purchases at "average terminal price" under the statute, a gallon of gasoline that retails at **$3.43** per gallon has a built in markup price of approximately **$.29** per gallon.  Likewise, a gallon of diesel that retails at **$2.99**, has a built in markup price of approximately **$.25** cents per gallon.  (*See* D. 36, Decl. of Richard Peterson, ¶ 6).

In May/June 2008, gasoline and diesel prices were as follows:

- In the Midwest region of the United States, the retail price of regular gasoline per gallon reached **$3.98** per gallon, and the average price of diesel fuel reached **$4.61** per gallon.

- In May 2008, prices for fuel in Wisconsin (charged by competitors of Flying J) reached **$4.199** per gallon for regular gasoline and **$4.859** per gallon for diesel fuel.

- Applying Wisconsin's 9.18% minimum markup and assuming that the retailer purchases at "average terminal price" under the statute, a gallon of gasoline that retails at **$3.98** per gallon has a built in markup price of approximately **$.33** per gallon.  Likewise, a gallon of diesel that retails at **$4.61**, has a built in markup price of approximately **$.39** cents per gallon.  (*See* D. 36, Decl. of Richard Peterson, ¶ 7).

While gasoline and diesel prices increased between 300% and 360% from 1998 through 2008, during the same ten years inflation has been approximately 33%.  Flying J,

Case 2:08-cv-00110-RTR   Filed 02/11/09   Page 3 of 18   Document 50

because of its efficiencies, can sell motor fuel with substantially less markup than the imposed 9.18% markup over the "average terminal price" and still make a reasonable profit.

## II.     Prior Action

On March 12, 2007, Flying J filed its amended answer and affirmative defenses in a previous case, *Lotus Business Group LLC v. Flying J Inc.*, Case No. 07-C-144.  Therein, Flying J challenged the constitutionality of the Unfair Sales Act as it applies to motor vehicle fuel.  The parties consented to jurisdiction before Magistrate Judge William Callahan.

In a letter to Attorney General J.B. Van Hollen, Flying J informed the State of Wisconsin of its constitutional challenge to the Statute.  Flying J attached copies of the Complaint and Amended Answer.  Flying J filed a motion for summary judgment, contending that the Statute was unconstitutional under the Sherman Act and the Supremacy Clause.  Flying J provided a copy of this motion to Attorney General Van Hollen.  In a letter directly to Judge Callahan, the Wisconsin Attorney General's Office acknowledged receiving Flying J's letters and its notice of the proceedings, and informed Judge Callahan of the State's decision not to appear or participate.  The letter further informed Judge Callahan that the "Attorney General may seek to appear if the issue of the constitutionality of a statute or ordinance is raised on appeal."

On October 12, 2007, after full summary judgment briefing by the parties and the submission of a record of undisputed evidence, Judge Callahan granted Flying J's motion for summary judgment. Judge Callahan held that the motor vehicle fuel provisions of the Statute were unconstitutional under the Supremacy Clause of the United States Constitution.  *See*

*Lotus Business Group LLC v. Flying J, Inc.*, 532 F. Supp. 2d 1011 (E.D. Wis. 2007). Judge Callahan then denied a motion to alter or amend judgment. *Id.* The State of Wisconsin chose not to intervene in the Prior Action at any time, including for purposes of reconsideration, and neither Lotus Business Group nor the Wisconsin Attorney General's Office appealed the Court's final judgment.

Despite the Court's ruling in the Prior Action, the State of Wisconsin continues to require Flying J to issue motor fuel reports to the State under the Unfair Sales Act. Thus, on October 12, 2007, the State of Wisconsin sent an enforcement letter to Flying J under the statute concerning Flying J's alleged fuel prices. On October 30, 2007, Flying J responded by informing the State of Wisconsin of Judge Callahan's decision and order finding the Act unconstitutional. Despite Judge Callahan's ruling, the State of Wisconsin continues to require Flying J and other motor fuel retailers to issue pricing reports to the Department of Agriculture under the Statute, with the implicit threat of enforcement actions, civil penalties or other remedies to follow.

Flying J brought the instant action to enjoin the State of Wisconsin from enforcing the Unfair Sales Act. Both parties filed motions for summary judgment.

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of

-5-

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## I.    Collateral Estoppel

Flying J argues that the State of Wisconsin should be collaterally estopped from litigating the constitutionality of the Unfair Sales Act. Collateral estoppel, also known as "issue preclusion," refers to the "effect of a judgment in foreclosing litigation in a subsequent action of an issue of law or fact that has been actually litigated and decided in the initial action." *LaSalle Nat'l Bank v. County of DuPage*, 856 F.2d 925, 930 n.2 (7th Cir. 1988).

Collateral estoppel is a judge-made doctrine that serves the "dual purpose of protecting litigants from the burden of re-litigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). Although there is no strict test for privity, the focus is whether the non-party was adequately represented in the original action. *See United States ex rel. Yankton Sioux Tribe v. Gambler's Supply, Inc.*, 925 F. Supp. 658, 664 (D.S.D. 1996) (citing *Meza v. General Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990)); *Tice v. American Airlines, Inc.*, 162 F.3d 966, 972 (7th Cir. 1998) ("a conclusion that the interests of the nonparties were sufficiently aligned with the earlier litigants would be impossible unless, among other things, the earlier litigants would have been adequate representatives of the later litigant(s)").

-6-

Flying J argues that Lotus Group was an adequate representative for the State of Wisconsin in the Prior Action. As a general matter, an alignment of interests does not compel a conclusion in favor of privity and adequate representation. This is particularly true when, as here, estoppel is asserted against a governmental entity. *See Kerr-McGee Chemical Corp. v. Hartigan*, 816 F.2d 1177, 1180-81 (7th Cir. 1987) (the State of Illinois, "representing the interests of the people of the state, [should not] be prevented from litigating an issue on behalf of the people merely because the issue has been previously litigated by private parties in an action to which the state was not a party").

Flying J presumes adequate representation because Lotus Group argued in support of the Unfair Sales Act's constitutionality, and the Attorney General is now pursuing many (if not all) of the same arguments. A private party necessarily has different motives for the pursuit and allocation of resources to litigation than does a governmental entity. That many of the same arguments are being parroted by the Attorney General is not surprising. The Attorney General still brings his own perspective and expertise into the equation. He should not be precluded from having his day in court only because the same issue arose in the context of a private dispute. *See Kerr-McGee*, 816 F.2d at 1180 n. 4 ("to assume that private individuals can properly be viewed as representative of a particular government" is a "daring analytical leap").

To continue the point, in the Prior Action, Lotus Group sought relief under the Statute's parallel enforcement scheme. *See* Wis. Stat. § 100.30(5m) (allowing a private cause of action for "temporary or permanent injunctive relief or an action against the person

-7-

for *3 times the amount of any monetary loss sustained or an amount equal to $2,000,* whichever is greater, multiplied by each day of continued violation, together with costs, including accounting fees and reasonable attorney fees") (emphasis added). Therefore, Lotus Group's interest at least potentially related to the recovery of its own economic losses that were caused by Flying J's unfair sales practices. In this action, Flying J is attempting to enjoin the State of Wisconsin from enforcing the penalty provisions of the Unfair Sales Act.[1] The distinction between the State seeking enforcement and a private party (Lotus Group) attempting to recover damages is obvious. The State's interest in enforcing the Act relates to the regulation of unfair competition in the sale of motor vehicle fuel. A private suit may encourage compliance with the Act's provisions, but this does not mean that Lotus Group was an adequate representative for the State of Wisconsin as it relates to enforcement of the Unfair Sales Act. *See Kerr-McGee* at 1181 (comparing the private interests of those living near a waste facility with the interests of the State of Illinois, which is "interested not only in improving the welfare of those who live around the facility but also with ensuring that the interests of the people of the State of Illinois as a whole are not adversely affected").

Finally, Flying J argues that the Attorney General should be collaterally estopped because he was given notice and an opportunity to intervene in the Prior Action. *See* Fed. R. Civ. P. 5.1(a)(2); 28 U.S.C. § 2403(b) (requiring certification to the Attorney General of

---

[1] The State may "commence an action on behalf of the state to recover a forfeiture of not less than $50 nor more than $500 for the first violation and not less than $200 nor more than $2,500 for each subsequent violation." § 100.30(4). The State may also issue a "special order" requiring a retailer (such as Flying J) to cease and desist sales in violation of the Unfair Sales Act, under penalty of forfeiture "not less than $200 nor more than $5,000 for each violation." § 100.30(5)(a).

-8-

a State and an opportunity to intervene when the constitutionality of a state statute is drawn in question); Wis. Stat. § 806.04(11). To the contrary, there is no authority for the proposition that a governmental entity provided notice of a constitutional challenge to one of its statutes in the context of private litigation must "intervene or suffer the consequences. Such a construction is plainly wrong." *Estate of Kunkel v. United States*, 689 F.2d 408, 420 (3d Cir. 1982) (Becker, J., concurring) (citing legislative history). While the Attorney General may have a general duty to defend Wisconsin statutes against constitutional attack, this does not mandate intervention and justify the application of preclusion principles. For better or worse, intervention is a strategic decision left to the better judgment of the Attorney General.

## II. Preemption

Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The doctrine of preemption is derived from the Supremacy Clause, which "operates to prevent the enforcement of state laws that conflict with federal laws or regulations." *Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005). "A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption." *Boomer v. AT & T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002). Put simply, when federal and state laws conflict, the doctrine of preemption is

Case 2:08-cv-00110-RTR   Filed 02/11/09   Page 9 of 18   Document 50

applied, and it resolves the conflict in favor of the federal statute. *See United States v. Palumbo Bros., Inc.*, 145 F.3d 850, 862 n.6 (7th Cir. 1998).

## A.    The Sherman Act

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Courts normally apply a "rule of reason" analysis when analyzing a particular restraint. Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature and effect." *County Materials Corp. v. Allan Block Corp.*, 502 F.3d 730, 735 (7th Cir. 2007). *Per se* liability "is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

Flying J challenges the Unfair Sales Act's motor fuel provisions as a *per se* restraint of trade in violation of the Sherman Act. The Court agrees that the Act authorizes and enforces resale price maintenance among competitors, "a *per se* violation of § 1 of the Sherman Act since the early years of national antitrust enforcement." *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 341 (1987).

To illustrate, the Act allows motor fuel retailers to match (but not undercut) their competitors' prices. *See* Wis. Stat. § 100.30(6)(a)7; Wis. Admin. Code § ATCP 105.009(4).

It forbids retailers from selling motor vehicle fuel below cost, which is based on the average posted terminal price plus a minimum markup of 9.18%. *See* Wis. Stat. §§ 100.30(2)1m.c; 100.30(2)(a); 100.30(3). In addition, the State's evidence confirms that retailers must hold their posted prices for at least 24 hours. (D. 28, Grunewald Affidavit, ¶ 6). The minimum markup percentage creates a range in which competitors may engage in collusive parallel pricing, which is exacerbated as the wholesale price of gasoline fluctuates. Therefore, the Act is a *per se* restraint of trade because it authorizes and enforces a parallel (or horizontal) pricing policy. "Mandatory industrywide resale price fixing is virtually certain to reduce interbrand competition as well as intrabrand competition, because it prevents manufacturers and wholesalers from allowing or requiring retail price competition." *324 Liquor Corp.*, 479 U.S. at 342.

The State argues that the Unfair Sales Act does not violate the Sherman Act because there is no "concerted action." Rather, the State attempts to characterize the restraint of trade as nothing more than a "unilateral act" of its legislature. The State relies on *Fisher v. City of Berkeley*, 475 U.S. 260 (1985), which involved a rent control ordinance. The Court held that there was no concerted action and no Sherman Act violation because "control over the maximum rent levels of every affected residential unit has been unilaterally removed from the owners of those properties and given to the Rent Stabilization Board." *Fisher*, 475 U.S. at 267. "A restraint imposed unilaterally by government does not become concerted-action within the meaning of the statute simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must

-11-

obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy." *Id.*

However, the Court in *Fisher* clarified that "[n]ot all restraints imposed upon private actors by government units necessarily constitute unilateral action outside the purview of § 1 [of the Sherman Act]. Certain restraints may be characterized as 'hybrid,' in that nonmarket mechanisms merely enforce private marketing decisions. Where private actors are thus granted 'a degree of private regulatory power,' the regulatory scheme may be attacked under § 1." *Id.* at 267-68 (internal citations omitted). For many of the reasons already stated, the Unfair Sales Act is a "hybrid" restraint. When a state "compels retailers to follow a parallel price policy, it demands private conduct which the Sherman Act forbids." *Id.* at 268 (quoting *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 389 (1951)); *see also California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 103 (1980) (State of California's system for wine pricing "plainly constitutes resale price maintenance in violation of the Sherman Act" because "the wine producer holds the power to prevent price competition by dictating the prices charged by wholesalers").

Finally, the State argues that the restraint should be judged according to a "rule of reason" analysis. *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, — U.S. —, 127 S. Ct. 2705 (2007). *Leegin* overruled longstanding precedent and held that vertical price restraints (typically between a manufacturer and a retailer) should be judged according to a "rule of reason" and are no longer *per se* unreasonable. *Leegin*, 127 S. Ct. at 2725. Presumably, the State means to say that the restraint imposed by the Unfair Sales Act is a

-12-

vertical restraint. However, the restraint here is also horizontal because it effects competing gasoline retailers in Wisconsin. *See Lotus Business Group*, 532 F. Supp. 2d at 1028 ("to the extent that the provisions of the Wisconsin statute create vertical price restraints, they also facilitate the creation of horizontal price fixing"). *Leegin* reaffirmed that a "horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful." *Leegin* at 2717.

Admittedly, the Supreme Court's pronouncements in *Midcal* and *324 Liquor* are somewhat confusing regarding the distinction between horizontal and vertical restraints. *See 324 Liquor* at 342 ("Although the horizontal restraint in *Midcal* may have provided an additional reason for invalidating the statute, our decision in *Midcal* rested on the 'vertical control' of wine producers, who held 'the power to prevent price competition by dictating the prices charged by wholesalers'"). To the extent the distinction is relevant, the Court agrees with Judge Callahan when he states that the Unfair Sales Act "is inconsistent with § 1 of the Sherman Act under both the rule of reason and the *per se* rule." *Lotus Business Group* at 1028.

As in *Lotus Business Group*, Flying J submitted a Federal Trade Commission study and a report from the Wisconsin Policy Research Institute, both of which conclude that the Unfair Sales Act restricts competition and harms consumers in the form of higher gas prices. (D. 35-4, Exhibit C; D. 35-5, Exhibit D). According to the FTC,

> the Act aims to protect individual competitors, not competition, thereby discouraging pro-competitive price-cutting. Moreover, the Act defines 'cost' in a way that lacks a firm economic foundation and likely leads to significantly higher prices.

-13-

> Finally, we believe that the Act is unnecessary, both because
> scholarly studies and court decisions indicate that
> anticompetitive below-cost pricing happens infrequently, and
> because the federal antitrust laws already prohibit below-cost
> pricing.

(D. 35-4 at 2). Similarly, the Wisconsin Policy Research Institute analyzed data which suggested that "the law has indeed kept gasoline prices higher than would otherwise be the case." The Institute concluded that the Act "benefits retail gas station owners at the expense of consumers and should be repealed." (D. 35-5 at 7). The State fails to contradict or undermine this evidence. In other words, the State confusingly argues in favor of a rule of reason but then fails to argue why the Act is a reasonable restraint.

### B.    Antitrust immunity

In *Parker v. Brown*, 317 U.S. 341 (1943), the Supreme Court held that the Sherman Act does not apply to "the anticompetitive conduct of a State acting through its legislature." *Town of Hallie v. Eau Claire*, 471 U.S. 34, 38 (1985). Therefore, even though the Unfair Sales Act conflicts with the Sherman Act, it may be saved from preemption under *Parker* and the doctrine of "antitrust immunity." The Supreme Court espouses a two-part test for antitrust immunity. First, the challenged restraint must be "clearly articulated and affirmatively expressed as state policy." *Midcal*, 445 U.S. at 105. Second, the policy must be "actively supervised" by the State itself. *See 324 Liquor* at 343.

The parties are in essential agreement that the first part of the test is met. In this respect, the Court agrees with Judge Callahan that the purpose of the Unfair Sales Act – to regulate the sale of merchandise below cost in order to prevent deceptive advertising and

-14-

unfair methods of competition – is clearly stated by the Act itself. *See Lotus Business Group* at 1019 (noting that the statute's "effectiveness in accomplishing its purpose is immaterial to whether the statute is clear in stating its purpose"). However, the second part of the test – active supervision – is not satisfied.

As an initial matter, the State argues that the Unfair Sales Act meets the active supervision requirement because it does not delegate any degree of control over the markup percentage to private parties. The State seizes on a footnote in *324 Liquor Corp.* where the Court observed that a "simple 'minimum markup' statute requiring retailers to charge 112 percent of their *actual wholesale cost* may satisfy the 'active supervision' requirement, and so be exempt from the antitrust laws under *Parker*." *324 Liquor Corp.* at 345 n.6 (emphasis added). While it is true that the Unfair Sales Act's markup percentage is fixed, the markup is not based on actual costs. Instead, it is based on the "average posted terminal price" without regard to actual costs. *See* Wis. Stat. §§ 100.30(2)1m.c; 100.30(2)(a). As the Court explained, the statute at issue in *324 Liquor Corp.* was not a "simple minimum markup statute because it impose[d] a markup on the 'posted bottle price,' a price that may greatly exceed what the retailer actually paid for the liquor." *Id.* The same is true here as in *324 Liquor Corp.* The "average posted terminal price" may be significantly higher than the actual cost to a particular retailer.

Therefore, some type of state supervision is required, both with regard to the markup percentage and the "average posted terminal price." To determine whether a pricing restraint is "actively supervised," courts examine whether the State "establishes prices" or "reviews

-15-

the reasonableness of the price schedules;" whether it "regulate[s] the terms of fair trade contracts;" and whether it "monitor[s] market conditions or engage[s] in any 'pointed reexamination' of the program." *Midcal* at 105. The Unfair Sales Act's markup percentage was changed by the Wisconsin legislature only one time, from 6% to 9.8% in 1997.[2] More glaring, there is no program or effort to "determine whether the 'average posted terminal price' bears a close (or any) relationship to the actual price paid by retailers." *Lotus Business Group* at 1023. A State may not "simply authorize price setting and enforce the prices established by private parties." *Midcal* at 105.

The State argues that it undertakes enforcement efforts to ensure compliance with the Unfair Sales Act. These efforts do nothing to ensure the reasonableness of gas prices in Wisconsin. In other words, enforcement matters little when the Act being enforced creates a horizontal pricing mechanism. "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Midcal* at 105.

The State argues that it engages in analysis at the administrative and legislative level. "Mere debate or discussion without the undertaking of any action" does not satisfy the active supervision requirement. *Lotus Business Group* at 1024; *see also 324 Liquor* at 345 n.7 ("Neither the 'monitoring' by the SLA, nor the periodic reexaminations by the state legislature, exerts any significant control over retail liquor prices or markups"); *Patrick v.*

---

[2] As the FTC observed, the Act employs "one of the steepest minimum markups on retail fuels in the country. . . . [T]he Act's use of the 9.18% measure – as well as the 3% and 6% measures – appears completely arbitrary. . . In fact, the minimum markup percentages do not, as the Act suggests they should, accurately reflect a 'proportionate part of the cost of doing business.'" D. 35-4 at 5.

*Burget*, 486 U.S. 94, 101 (1988) ("The mere presence of some state involvement or monitoring does not suffice"). The Court also rejects the State's arguments that these are policy arguments best left to the state legislature. To the contrary, the legislative enactments of the State of Wisconsin must comply with federal law. Failure to comply simply results in preemption under the Supremacy Clause. Stated another way, the State of Wisconsin "has displaced competition among [gasoline] retailers without substituting an adequate system of regulation." *324 Liquor* at 345. This the State cannot do, no matter the rationale.

## IV.    Declaration – Permanent Injunction

For the foregoing reasons, the Unfair Sales Act creates an illegal restraint of trade in violation of § 1 of the Sherman Act as it pertains to the sale of motor vehicle fuel in the State of Wisconsin. Moreover, the Act does not qualify for antitrust immunity under *Parker*. Therefore, the Unfair Sales Act is unconstitutional with respect to its motor vehicle fuel provisions.

Under *Ex Parte Young*, 209 U.S. 123, 156 (1908), the Court may enjoin state officers "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution." Flying J filed this lawsuit as a "first strike" to prevent the defendants' attempts to enforce the Unfair Sales Act. The "prospect of suit" to enforce an unconstitutional law supplies the necessary irreparable injury. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992).

-17-

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.      Flying J's motion for summary judgment [D. 15, 37] is **GRANTED**;

2.      The defendants' motion for summary judgment [D. 27] is **DENIED**;

3.      The motor vehicle fuel provisions of the Unfair Sales Act are unconstitutional; and

4.      The defendants are enjoined from enforcing the motor vehicle fuel provisions of the Unfair Sales Act.

Dated at Milwaukee, Wisconsin, this 11th day of February, 2009.

SO ORDERED,


*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**Chief Judge**